419 So.2d 148 (1982)
James Porter DEAN
v.
Rodger N. CONN.
No. 53662.
Supreme Court of Mississippi.
August 11, 1982.
Rehearing Denied September 22, 1982.
Sharp & Fisher, William L. Sharp, Corinth, for appellant.
Wilson & Hinton, Phil R. Hinton, Corinth, for appellee.
Before WALKER, P.J., and BROOM and ROY NOBLE LEE, JJ.
WALKER, Presiding Justice, for the Court:
This is an appeal from a judgment of the Circuit Court of Alcorn County, Mississippi, wherein the appellee was awarded $17,524.17 damages resulting from malpractice of the appellant, an attorney-at-law.
The principal issue in this case is whether the appellant conducted his inquiry into who constituted the heirs at law of the deceased, Mrs. Sue N. Gant, in accordance with the knowledge, skill and ability ordinarily possessed and exercised by members of the legal profession in Alcorn County, Mississippi.
During November of 1973, Mrs. Sue Gant contacted James Porter Dean, an attorney, for the purpose of preparing a will and easements. Mrs. Gant met with Mr. Dean at his law office in Corinth, and during this meeting Mrs. Gant made known to Mr. Dean her wishes with respect to provisions of her will concerning her real and personal *149 property. However, Mrs. Gant never returned to execute either the will or the easements.
On August 31, 1974, Mr. Dean was summoned to the hospital room of Mrs. Gant. Mrs. Gant was being discharged when Mr. Dean arrived and they agreed to meet at the appellant's office the next week to execute her will. The next day, September 1, 1974, Mrs. Gant died.
Shortly after Mrs. Gant's death, Mrs. Olga Martin and Mrs. Cariece Conn, sisters of the deceased, met with Mr. Dean for the purpose of opening and guiding the estate through probate. On September 13, 1974, Mrs. Conn and Mrs. Martin returned to the appellant's office to sign the petition for appointment of co-administratrices and other probate documents.
The appellant testified that, as was his usual procedure for determining heirs at law of a deceased, he questioned the sisters concerning other relatives of the deceased. At trial, the court admitted into evidence the notes made during the conversations with Mrs. Conn and Mrs. Martin. Dean further testified that nothing in the demeanor nor statements during his prior meetings with the late Mrs. Gant, nor the subsequent conversations with the sisters and their families, indicated that there were any relatives of the deceased other than Mrs. Conn and Mrs. Martin.
Subsequently, the real and personal property of the deceased was divided between Mrs. Conn and Mrs. Martin. Mrs. Conn received the north 80 acres and Mrs. Martin the south 80 acres of one of the tracts of land. Shortly after the property was divided, Mrs. Martin sold her south 80 acres to her nephew, Rodger N. Conn, the appellee herein, for $20,000.00. Mrs. Conn, the appellee's mother, gratituously conveyed the north 80 acres to Rodger Conn.
Since Dean handled the probate matters of the late Mrs. Gant, Rodger Conn employed James Dean to check the title to the south 80 acre tract for the purpose of securing a loan. Dean, with the information he received from the late Mrs. Gant, Mrs. Martin and Mrs. Conn, checked and certified that the title had indeed been held in fee simple by the deceased, and now by the estate of Mrs. Sue N. Gant. He simultaneously prepared a warranty deed conveying the 80 acres from Mrs. Martin and Mrs. Conn to Rodger Conn which recited that Mrs. Martin and Mrs. Conn were the only heirs at law of Mrs. Sue Gant. Based on the appellant's deed and certificate of title, Rodger Conn obtained a loan and paid his aunt, Mrs. Martin, $20,000.00 for her 80 acres.
From 1974 until 1979 Rodger Conn resided on, improved and farmed the 160 acres. However, early in 1979, the other heirs of the late Mrs. Gant contacted Mrs. Martin, Mrs. Conn and Rodger Conn demanding their portion of Mrs. Gant's estate. In order to avoid protracted litigation, Rodger Conn and his attorneys negotiated with the remaining heirs and purchased the outstanding three-fifths interest in the 160 acres.
At trial, the plaintiff and defendant requested and were granted, among others, the following instructions, and no question is raised on appeal concerning them.
INSTRUCTION P-5
The Court instructs the jury, that the Plaintiff RODGER N. CONN, employed the Defendant, JAMES P. DEAN, to search the title to eighty (80) acres of land and to prepare a Warranty Deed to be signed by the owners of said land in order for the Plaintiff to obtain a loan for, and complete the purchase of, said land. The Court further instructs the jury that it was the duty of the Defendant to exercise the care, skill, knowledge and ability ordinarily possessed and exercised by members of the legal profession in this locality, in preparation of a Certificate of Title and Warranty Deed for the Plaintiff. The Defendant was bound to exercise ordinary diligence and a reasonable degree of care and skill with reference to the character of the business he undertook for the Plaintiff.
If you believe from a preponderance of the evidence in this case that

*150 1. the Defendant knew or should have known, by the exercise of the care, skill, knowledge and ability ordinarily exercised by members of the legal profession in this locality, that the Certificate of Title and Warranty Deed prepared by him did not disclose to Plaintiff all owners of the land purchased by Plaintiff, and
2. the Defendant's failure to exercise such care, skill, knowledge and ability was the sole proximate cause or proximate contributing cause of Plaintiff's damages,
then your verdict shall be for the Plaintiff.
However, if you believe from the evidence in this case that the Plaintiff has failed to prove any one of these elements by preponderance of the evidence in this case, then your verdict shall be for the Defendant.
INSTRUCTION D-1
The court instructs the jury that a lawyer is not an insurer or guarantor of the correctness of his work or the results which will be attained, but he is only required to exercise the knowledge, skill and ability ordinarily possessed and exercised by members of the legal profession similarly situated in this locality; and
If you believe that Jim Dean exercised that knowledge, skill and ability ordinarily possessed and exercised by members of the legal profession similarly situated in this locality in preparing the certificate of title to Northeast Mississippi Production Credit Association, then you shall not return a verdict against Jim Dean, although you may further find that said certificate of title was not fully accurate.
INSTRUCTION D-3
The court instructs the jury that in determining whether an Attorney exercised the knowledge, skill and ability ordinarily possessed and exercised by members of the legal profession similarly situated in this locality, you are not permitted to arbitrarily set a standard of your own or determing the question from your personal knowledge. On questions of legal knowledge, skill, ability and procedure in preparing a certificate of title to land, only those qualified as expert are permitted to testify. The standard of care must be established by individuals qualified as expert who are familiar with the preparation of certificates of title in this community under like circumstances. It follows, therefore, that the burden is upon the plaintiff to establish the standard of care exercised by members of the legal profession similarly situated in this locality through evidence presented by an individual qualified as an expert in the preparation of certificates of title in this community and as an expert witness.
On appeal, the appellant contends that "There was no expert testimony that defendant failed to exercise the requisite care and skill in performing the services for plaintiff."
Generally, the same standards of professional conduct are applicable to the attorney and physician alike, namely:
(1) Both are required to use that degree of care, skill and diligence which is commonly possessed and exercised by attorneys/physicians in that locality.
(2) Neither is an insurer or guarantor of results which will be attained.
(3) Unsuccessful results do not give rise to a presumption of negligence.
(4) Both are liable only for negligent failure to use the requisite care and skill.
As to Attorneys, see Nause v. Goldman, 321 So.2d 304 (Miss. 1975); Thompson v. Erving's Hatcheries, Inc., 186 So.2d 756 (Miss. 1966). As to Physicians, see Dazet v. Bass, 254 So.2d 183 (Miss. 1971); Copeland v. Robertson, 236 Miss. 95, 112 So.2d 236 (1959). As to Dentists, see Newport v. Hyde, 244 Miss. 870, 147 So.2d 113 (1962).
The generally accepted rule is that expert testimony is ordinarily necessary to support an action for malpractice of a professional man in those situations where special skills, knowledge, experience, learning or the like are required.
*151 One reason for the rule is demonstrated by the situation sub judice in that laymen tend to think that an attorney's certificate of title affords the same broad protection as title insurance which is not true.
Although there are circumstances in which a jury might determine the issue of an attorney's negligence without benefit of expert testimony, this case falls within the general rule where a jury is confronted with issues which require specialized knowledge or experience in order to be properly understood, and which cannot be determined intelligently merely from the deductions made and the inferences drawn on the basis of ordinary knowledge, common sense and practical experience gained in the ordinary affairs of life. 31 Am.Jur.2d Expert and Opinion Evidence § 16 (1967); 61 Am.Jur.2d Physicians & Surgeons § 349 (1981); 7 Am.Jur.2d Attorneys at Law § 225 (1980); Annot., 81 A.L.R.2d 597 (1962); Annot., 17 A.L.R.3d 1442, 1443 (1968).
Appellant's contention that there was no expert testimony that defendant failed to exercise the requisite care and skill in performing services for plaintiff is without merit.
The plaintiff called as an expert witness the Honorable James E. Price, a member of the Bar in Alcorn County, who testified as to the standard of care exercised by attorneys in that area when determining the heirs at law of a person who died intestate and whose name appears in a chain of title to real property. His testimony follows, in part:
A. I am a member of the Alcorn County Bar Association, the Mississippi State Bar Association, American Bar Association, American College of Trial Lawyers.
Q. And have you had occasion during your thirty-one years of practice to handle estate matters?
A. I have.
Q. Consisting of opening and closing estates?
A. Yes.
Q. And have you also been involved in preparing title certificates and doing title searches?
A. I have.
Q. Very briefly, Mr. Price, for the benefit of the jury, what is a title certificate?
A. A title certificate is a certificate made by an attorney that he has checked titles to certain property and that the title is good except for such objections as he lists in the title certificate.
Q. All right. Have you  in your years in this locality had a chance to observe other attorneys involved in estate matters and also title certificates and title checks?
A. I have.
Q. And have you had an opportunity to discuss with your fellow attorneys in this locality the various methods and procedures used?
A. Yes.
Q. Mr. Price, from you [sic] and from you [sic] discussion with your fellow attorneys in this locality, have you discovered a standard of care or skill or ability that an attorney in this locality is presumed to possess and should exercise for his clients as it relates to determination of heirs in an estate as it relates to preparing title certificates?
A. Yes.
BY MR. SHARP: If the Court please, we would ask that he specify specifically what area we are talking about with reference to the preparation of certificates of title?
BY MR. HINTON:
Q. I will modify that question which was quite lengthy. As far as title certificate is concerned with regard to determining heirs when an attorney discovers a deceased person's holding title in the chain?
A. Yes, I am familiar with the general standard followed by attorneys in this area in ascertaining heirs when there apparently is a deceased person who died without leaving a will.

*152 Q. Thank you, Mr. Price. What is the standard or procedure in  as it involves determination of heirs that you just indicated?
A. Well, in checking a title, if an attorney discovers a transaction, which indicates that someone, some prior owner has died without leaving a will, there is no will recorded in the will book, no will has been probated, then it is necessary for the attorney to determine the legal heirs of the deceased owner of the property. Now the first step is to examine the Chancery Court records to see if there has been an administration of an estate. Because in the administration of an estate the heirs would be set forth in the court documents. If there has been no administration of the estate, then the attorney contacts a relative of the dead person to ascertain what relatives that dead person did have. If there is no relative, then you contact some friend or some acquaintance who knew that family and was familiar with the family relationship. You are trying to determine first whether or not a dead person left a living spouse or left any children or descendants of children. There are different catagories for descent and distribution. If they did not leave a living spouse or child or children or descendants of children, then you are trying to determine if their parents were living at the time of their death, how many living brothers and sisters they had and whether they had any brothers and sisters who were deceased who had descendants. And then you go into the other categories if you don't find any of those. And ordinarily you will take a written statement or affadavit [sic] from the family member or relative who gives you the information for your records that shows how you arrived at the legal heirs.
Q. All right, now, would this  would the procedure, would determination of heirs when you commence the administration of an estate be any different?
A. No, it would be exactly the same except when the people came and had you open up and [sic] estate, assuming that they are relatives of the deceased person and your first inquiry is whether or not they know of any will. And if they know of no will, well then you ask if the deceased person had a living husband or wife. Then you inquire about whether or not they had any children or whether the person ever had any children, so you determine if there are any descendants. If you determine that there are  was no surviving spouse, no surviving child or descendants of a child, then the next question is to inquire about whether the parents are living. And if they are not living, or if they are, because they are in the same group, then you inquire about how many living brothers and sisters are they. And then the next question is how many deceased brothers and sisters are they. When did they die. Did they have any descendants. Are those descendants living. That way you determine the relatives and then by applying the law, you can ascertain the heirs.
Q. All right. Is that the only procedure that you are aware of in this locality?
A. Yes, sir, that is the standard procedure. If that procedure is available, if someone has died without relatives, then it gets more difficult because you have to make the inquiries from friends and acquaintances,
BY MR. HINTON: May I have just a moment, your Honor?
BY JUDGE GARDNER: Yes, sir.
BY MR. HINTON:
Q. Mr. Price, one last question. As I understand it, this is the standard care in this locality and anything less than this, below standard, is a breach of the duty of an attorney, is that correct?
A. That is the normal standard of care followed by attorneys in checking titles or in determining heirs for the administration of the estate and in my opinion, any attorney that deviated from that *153 would be deviating from the recognized standard.
BY MR. HINTON: That's all.
BY JUDGE GARDNER: All right, sir. Cross examination?
BY MR. SHARP: Yes, sir.
During the trial of this cause, the appellee, the appellee's father and the ladies who administered Sue Gant's estate, Mrs. Conn and Mrs. Martin, all testified that the appellant did not, at any time, ask any questions about the relatives or family of Sue Gant. Although the appellant, James Porter Dean, disputed their testimony, the following excerpts of his testimony are pertinent:
Q. Mr. Dean, on line number nineteen the question I asked you was, I said, "Obviously you discussed the heirs of Mrs. Sue N. Gant's estate or did you discuss with them her heirs that day?" That was referring to the first meeting. Your answer: "The procedure I follow  the way I do that, if I have a copy of a previous estate that I can go by, the parties appear in my office plus my secretary. I make notes of things said that are important for ramification and ask the questions to determine things that are important then I make a draft for my secretary to go by, go over the information with the parties that are there at the time and generally set a date for them to return to sign the necessary papers to probate the estate after my secretary had had an opportunity to type the papers." We want to skip now to page twenty-one. On line number fifteen, "Do you recall asking them who the heirs of Sue N. Gant were?" "Other than what my notes reflect." That was your answer. My question: "You don't recall the exact words that you might have used?" Your answer: "Not the exact words, no." "You are certain that you did ask that question?" Your answer: "I am sure I would have asked it because it's reflected in the petition. I go by it word for word. I am sure I asked who the heirs were." "Is that you " my question: "Is that your normal procedure to ask who the heirs are?" "Yes." "Do you have any specific way of getting the information you need?" Your answer: "I take the copy of the petition, I look at the top and I go all the way through it. I ask them specifically to give me the names of the heirs and their addresses so I can reflect it in the petition." My question: "This is your specific procedure in your office?" "Yes." Now, did you testify to that?
A. That's the same exactly as I just got through saying.
Q. Mr. Dean, I don't think it is but is that what you testified to?
A. Yes, sir.
Q. And is that correct? Is that your procedure?
A. That's the papers, you have the papers I used.
Q. I want to ask you to look again at the exhibit, I believe you are already hold, it should be number seven. The petition that you made notes on that day. What does the paragraph about heirs say?
A. Well, that  this one I had marked out one before and I had Mrs. S.N.G. and then my secretary would have picked up who it was, left surviving her as her sole and only heir at law the following persons and then the area was exed out which indicates to me that I dictated in that area what these people told me being the heirs.
... .
Q. You just said that it's your procedure to ask who are the heirs, give me the names and addresses.
A. Yes, sir, that's what we put in here.
Q. Yes, sir. And you heard Mr. Price testify as to what is necessary to ask, did you not?
A. I don't know that at the same time that I didn't go into the fact that there was any other brothers or any other living, or mother or father or anything else. I don't know what else I did ask.
... .

*154 A. It didn't say in here this is all I do, does it  in the deposition? You asked if I had a specific way of getting the information and I indicated I take a copy of the petition and go through it, specifically ask names and addresses of heirs reflected in the petition. That's your 
Q. You said, "I am sure I would have asked it because it is reflected in the petition."
A. Okay.
Q. This is on line twenty-three, page twenty-one. "I go by it word for word." Do you agree with it so far?
A. Yes, sir.
Q. "I am sure I asked who the heirs were." Flip to the next page. "Is it your normal procedure to ask who the heirs are?" You answer: "Yes." "Do you have a specific way of getting the information you need?" "I take a copy of the petition, I look at the top and I go all the way through. I ask them specifically to give me the names and addresses of their heirs." Now, is that correct, Mr. Dean?
A. Yes, sir.
It was for the jury to determine from the evidence whether appellant had exercised the degree of care, skill, knowledge and ability ordinarily possessed by members of the legal profession in his locality in the preparation of the title certificate in question and the verdict is supported by the evidence.
The remaining assignments of error are without merit.
For the reasons stated above, the judgment of the lower court is therefore affirmed.
AFFIRMED.
PATTERSON, C.J., SUGG, P.J., and BROOM, ROY NOBLE LEE, BOWLING, HAWKINS, DAN M. LEE and PRATHER, JJ., concur.